# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PATRICIA WOLSHON,

        Plaintiff,

v.

AMERICAN COMMUNICATIONS
NETWORK, INC.,

        Defendant.

_____/

Case No. 03-73679

United States District Judge
Arthur J. Tarnow

Magistrate Judge
Wallace Capel, Jr.

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]

### I.  BACKGROUND

This is a sexual harassment case under Michigan's Elliott-Larsen Civil Rights
Act.  Plaintiff alleges she was subjected to a hostile work environment created by her
co-employees and supervisors and to *quid pro quo* sexual harassment by her
immediate supervisor.  Plaintiff also claims her employment was terminated in
retaliation for her complaints concerning the hostile work environment.

Plaintiff originally filed this case in Oakland County Circuit Court.  Her
complaint alleged violations of the Michigan Elliott-Larsen Civil Rights Act, the
federal Equal Pay Act, 29 U.S.C. § 206(d), and the common law tort of intentional
infliction of emotional distress.  Defendant removed the case to this Court based on
Plaintiff's Equal Pay Act claim.

According to Plaintiff, discovery has revealed no basis for her Equal Pay Act claim and she is no longer pursuing that claim.[1]  However, there is no reason why the exercise of federal jurisdiction would be inappropriate in this case.  *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988) (Holding that "a district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate [based on principles of economy, convenience, fairness, and comity].").

Before the Court is Defendant's motion for summary judgment.  For the reasons that follow, the Court finds that there are triable jury questions as to Plaintiff's hostile environment and *quid pro quo* harassment claims, but that Plaintiff cannot establish a prima facie case for retaliation.  Therefore, Defendant's motion for summary judgment will be GRANTED IN PART and DENIED IN PART.

## II.  FACTS

### A.  Plaintiff's Employment With Defendant

Plaintiff Patricia (Patty) Wolshon began her employment with Defendant ACN in September of 1999 as an accounts receivable manager.  During her employment, Plaintiff received positive performance reviews, a promotion, and merit-based pay increases.

At ACN, Plaintiff became close friends with several co-workers:  Briana Bertalini Landridge, whom Plaintiff hired at ACN after supervising her at her previous job; Jane Walski, senior manager of revenue; and Lisa Lyskawa, a senior analyst of revenue management.

This group ate lunch together daily, went shopping on their lunch hour,

---

[1]In addition, Plaintiff is no longer advancing her claim for intentional infliction of emotional distress under state law.

exchanged joke e-mails, and discussed a range of topics. They were occasionally joined by Patricia Christian Seymour, a senior manager of corporate services. Apparently, Seymour and Walski are best friends and have known each other since age 3.

According to Plaintiff, conversations at work occasionally concerned sex, including aspects of their personal sex lives. The group often discussed the show "Sex In The City." Plaintiff's co-workers testified that she was apparently comfortable discussing and joking about sex in a graphic fashion.

Plaintiff's direct supervisor at ACN was Kathleen Regan, the director of revenue management. Regan is now openly lesbian. However, she testified that during Plaintiff's employment at ACN only a few co-workers were aware of her sexual orientation.

Plaintiff testified that Regan never disclosed her sexual orientation to her and they never discussed the topic. Rather, Plaintiff heard from other people that Regan was a lesbian. Plaintiff is not aware of any statements by Regan that she was "openly gay in the office."

Jayne Diorka is ACN's chief financial officer. Diorka and Regan worked together prior to their employment at ACN, and have known each other since 1988.

Regan and Diorka are also close friends with Adele Fransko, the company's human resource director. Regan, Diorka and Fransko socialized regularly outside of work, spent  time at Regan's home and traveled together to Regan's cottage in northern Michigan.

3

Certain members of Plaintiff's circle of friends were also well connected with the management group.  Walski and Lyskawa had known Diorka and Regan since 1996.  Seymour had known Diorka for 20 years.

### B.  Plaintiff's Allegations of Sexual Harassment

In February of 2001, Plaintiff took a business trip to Atlanta with Kathy Regan. Plaintiff testified that she had no idea why she was asked to go on the trip because it was tax related.  According to Plaintiff, Regan told her that she "liked her" several times during the trip.  Such statements made Plaintiff uncomfortable because they appeared to her to be motivated by sexual desire.

During a break, Regan "told [her] how much she liked [her] and she liked traveling with [her]."   (Wolshon Dep. at 149).  The comment made Plaintiff uncomfortable, particularly because Regan made these comments often.  For example, Regan would step into Plaintiff's office and say, "I just want to tell you I like you." (Wolshon Dep. at 150-51). Plaintiff believed the comments were of a sexual nature because Regan also told her how much she liked girls.  Plaintiff's personal journal states:

> Kathy made me go on a trip with her to Atlanta regarding taxes.  Not sure why I'm going.  I'm not the tax expert or department, ugh.  Whole trip Kathy keeps telling me how much she likes me.  Totally uncomfortable.

Wolshon Dep. at 190.

Regan testified to a different set of facts concerning the Atlanta trip. She believed that Plaintiff was properly asked to go to Atlanta because her job, which

4

involved company finances, billing, and credit, was tax oriented. In addition, Regan wanted Plaintiff to travel to Atlanta because Plaintiff has a degree in accounting and was the best person available for the trip from a pure accounting perspective. Regan denied ever telling Plaintiff that she liked her beyond the context of praising her work performance. She also denied telling Plaintiff that she "likes girls."

In July of 2001, Plaintiff met with Regan for a performance review. Regan gave Plaintiff her review and left the room. Plaintiff testified that when Regan returned she closed the door and squeezed Plaintiff's shoulder as she passed by. At the end of the meeting, Regan allegedly told Plaintiff how much she liked her and said, "'You could be promoted within one year to director,' if [you] would go out with [me] in an evening to get to know [me] better." (Wolshon Dep. at 140). Plaintiff was shocked, and asked if she could leave. Regan allegedly said that nobody would believe her and said, "What is said in these four walls stays in these four walls." *Id.* at 141.

At her deposition, Regan denied each of Plaintiff's allegations concerning the performance review. According to Regan, her office furniture is organized such that it would be extremely difficult and awkward for her to approach someone in the manner claimed by Plaintiff, even if she had stepped out for a break.

Plaintiff testified that she perceived Regan's actions as sexual advances. However, Plaintiff's personal notes contain the following entry concerning the incident:

> Received good review. Kathy will promote me to a director position, provided I went out to lunch with her, we got to know each other better.

5

*Id.* at 142-43.

Defendant emphasizes that Plaintiff's notes do not reveal any sort of discomfort with Regan's alleged comments.

Plaintiff concedes that she did not report Regan's comments to anyone. However, she argues that her failure to make a complaint was justified "because Kathy [Regan] and Jayne [Diorka] are very close" and because "[HR director Fransko] was very close friends, too, with Jayne Diorka and Kathy Regan." *Id.* at 157.

In August of 2001, Regan gave Plaintiff a gift certificate to a spa "for a job well done" on a sale. Plaintiff interpreted the gift certificate as a sexual gesture "[b]ecause it's a spa. It's a personal type thing where you have personal things done to your body." *Id.* at 284.

Regan also gave Plaintiff movie tickets as a gift. Plaintiff felt that the tickets were a sexual gesture because the theater was not far from Regan's house. Plaintiff believed that Regan wanted to meet her at the movies. However, Plaintiff's house was not far from the movie theater.

Regan testified that she always tried to personalize the gifts she gave to employees and that she felt the spa certificate was appropriate because Plaintiff "pays a lot of attention to her hair and beauty products and getting her nails done." Regan claims that the movie tickets were an appropriate gift for Plaintiff because she was "very much into movies." (Regan Dep. at 117-18). According to Regan, the tickets were part of a gift basket including popcorn and Blockbuster gift certificates.

6

Plaintiff also claims that she was routinely harassed about her physical appearance. Seymour and Walski admitted they made frequent references to the size of Plaintiff's breasts, which they nicknamed "the twins." On Plaintiff's birthday, Seymour signed a community birthday card, which was viewed and signed by ACN's upper management, "Happy Birthday to you & the twins."

Four of Plaintiff's co-workers and friends testified that Plaintiff referred to her own breasts as "the twins."

Plaintiff testified that some time in September of 2001, Jane Walski approached her following a meeting and said, "Your breasts are the twins; we call them the twins." (Wolshon Dep. at 126). Chris Roberts and Patty Christian were present for this comment, and they laughed about it along with Walski. Plaintiff told Walski that she was sensitive to such comments. Walski responded by saying, "You're not a sensitive person." *Id*.

Later in September or October of 2001, Jayne Diorka began a meeting by saying to Kathleen Regan, "Kathy, you're wearing your big-boob shirt today." (Wolshon Dep. at 132). Diorka then turned to Plaintiff and said, "Look at your big boobs on the table there," and asked Plaintiff what size her breasts were. *Id*. Plaintiff said, "I don't want to discuss this; can we get to the task at hand?" *Id*. Diorka responded, "I don't know what the problem is, a boob's a boob." *Id*. Plaintiff believed Walski and Regan witnessed these comments.

Plaintiff testified that she did not report Walski's and Diorka's comments to anyone because she didn't know who to report to at that time.

7

At some point while she worked at ACN, Plaintiff suffered an allergic reaction to a vaccination causing her lips to swell.  Jayne Diorka allegedly said to Plaintiff, "Oh my gosh.  Look at your lips and how swollen they are.  Are your other lips swollen too?"  *Id.* at 564-565.  Later, on Plaintiff's birthday, Diorka signed Plaintiff's birthday card with, "Hey Lips!  Kidding JD," surrounded by a red lips-shaped stamp. (Plaintiff's Exhibit 9).

On October 12, 2001, Plaintiff's birthday, Jane Walski and Briana Bertalini-Landridge gave Plaintiff a birthday card along with several sex toys, the most controversial of which was a blue, dolphin-shaped toy.  Plaintiff testified that she felt the gifts were intended to humiliate her.  According to Plaintiff, she was embarrassed and humiliated, and after receiving the gifts she returned to her office, cried, and called her husband.

Walski testified that sex toys were an appropriate gag gift for Plaintiff because some time prior to Plaintiff's birthday, Plaintiff and Briana Bertalini-Landridge called Walski into Plaintiff's office as they were joking around and looking through a sex toy catalog.

On October 12, 2001, Plaintiff engaged in the following e-mail correspondences with Kathy Regan:

Plaintiff:     You aren't leaving this company are you?

Regan:     Why would you say such a thing?

Plaintiff:     I can't say.  I have been sworn to secrecy.  But you didn't answer the question either.

8

Regan:          Of course not.

Plaintiff:      Okay.  That's all I needed to hear.

Regan:          Who's talking about me?

Plaintiff:      I can't say...I promised.  But I can tell you that I was very
                upset last Friday...so much so that I thought I should be
                putting my resume out.

Regan:          Did *someone* think I was on an interview or something???
                Did *someone* think I was lying about being up north?  What
                could I have possibly done recently that made someone
                think I was leaving???

Plaintiff:      Negative on both questions.  Are you [blind carbon-
                copying] anyone on these emails?  As you can tell I'm a
                little paranoid about this topic since I was sworn to secrecy.

Regan:          No, I'm not.  So why would someone think I'm leaving?
                Because I got new furniture?  IS IT JAYNE D WHO
                THINKS I'M LEAVING???

Plaintiff:      Nope.  You're making this very difficult for me to keep my
                mouth shut now.  Has nothing to do with your furniture and
                no Jayne isn't the individual(s).

Regan:          Well, there's only one other person who it could be (Jane
                Walski).  I still don't get why the hell she'd think I was
                leaving.  I actually love my job and have absolutely no
                plans of leaving anytime soon.

Plaintiff:      No it is not Jane Walski...honestly.

Regan:          please, she's the only other person who would even care

9

Plaintiff:     What are you talking about...a lot of people care!!!!!  And Jane doesn't have a clue about this one...trust me on this.

Regan:     If you do not give me a clue, I will send out a Farmington Hills e-mail regarding the Blue Dolphin (or whatever it's called).  And I'm not kidding.

Defendants' Exhibit 23.

Plaintiff believes that Regan's last statement, which threatened to send an e-mail to ACN's headquarters in Farmington Hills, Michigan, was a retaliatory threat. Defendant argues that Plaintiff "baited" Regan into making the statement by initiating an obscure discussion that challenged Regan's position with the company.

After she received Regan's last e-mail, Plaintiff walked to Regan's office and stated, "It stops now."

### C.  Plaintiff's Termination

In approximately February of 2001, before any of Plaintiff's sexual harassment allegations arose, Plaintiff and Walski were working together on a project that required them to access the company's "Q drive," where information for accounting and finance was located.  Plaintiff attempted to open a file labeled "salary" but could not open it because it was password protected.  Several weeks later, Plaintiff found a "passwords" file in the same directory as the salary file.

Using the passwords from the password file, Plaintiff and Walski looked up the salary of "every single high level person" at ACN.  (Walski Dep. at 59).  Walski testified that she was a willing participant and "devoured the information" because she was curious.  (Walski Dep. at 60).

10

On November 15, 2001, Walski approached Kathy Regan and told her that she and another employee had found salary information on the company's computer network. After some investigation, Kathy Regan, Adele Fransko, and Jayne Diorka interviewed Plaintiff concerning the incident. According to Regan's report,

> At approximately 2:15pm on Tuesday (11/27) Adele and Jayne met with Patty Wolshon in Jayne Diorka's office. Patty was immediately defensive and denied ever access (sic) or viewing the files. She indicated that she had heard rumors that the files existed but never independently investigated their existence. She would not provide the name or names of those who had discussed the files, as she does not participate in office gossip. She further stated that it's possible for anyone to gain access to her office during the day and use her computer (thus her access ID). If I.T's investigation brings forth her name, it's possible that someone else was actually using her ID to access the information. Patty's meeting lasted 5 minutes. Both Adele and Jayne believed that Patty was being untrue in her statements regarding her innocence.
>
> Jayne Walski was immediately called to Jayne Diorka's office. Jane was very emotional during the meeting. She admitted that Patty Wolshon accessed the files and then verbally communicated salaries to Jane. Jane never directly looked at the data. Jane could not remember who looked at the files first (her or Patty).
>
>                     \*    \*    \*
>
> I decided that terminating Patty's employment was in the best interests of ACN. Proportionate to her involvement, Jane Walski would be placed on written warning. Jayne concurred from a fiduciary perspective, Adele concurred from an HR perspective.

Pl. Exh. 26.

Plaintiff points out that Jane Walski was also a willing participant in the security breach and that Walski was merely given a warning for her involvement. ACN responds that Plaintiff's conduct warranted more severe punishment because she

11

actively sought out secure information and communicated the information to Walski, who never accessed the files herself.  In addition, ACN points out that Walski came forward with the information and admitted her involvement, while Plaintiff denied accessing or viewing the files.

Plaintiff argues that even though she initially accessed the secure files, Walski committed a more serious breach of the company's policy by disclosing to Patty Christian Seymour that she and Plaintiff had found the salary information.  In e-mail to Kathy Regan on November 16, 2001, Walski wrote:

> I barely slept!  I went home and told Michael everything!  It wasn't a good night.  Anyway, there is one more thing I didn't tell you.  I don't want to get anyone else in trouble!  When I first found out about the files, I told Patty C.  I only told her so that I could get some advice.  Don't worry, $'s were never discussed.  I just wanted to come totally clean with you. If there is any way of not bringing Patty C's name into this, I would be forever grateful.  She was just an innocent person brought into this ugly mess.  Well, I've told everything.  Please tell me I did the right thing.

Plaintiff's Exhibit 28.

Plaintiff points to two other security breaches that did not result in terminations.  First, in March of 2001, senior manager Sergio Navarette incorrectly told the director of credit and collections in Canada that commission checks were not sent out because the executives at ACN were using that money to fund another project.  (Regan Dep. at 138-39).  According to Regan, this information was "not true and actually was somewhat inflammatory."  *Id*.  Regan testified that Navarette's conduct amounted to a "breach of confidential information.  *Id*. at 143-44.  As a result, Navarette was given a written warning.  *Id*.  Navarette's employment was not

terminated because Regan deemed the incident worthy of a warning because the information was insulated from the "rep world, the people who were actually paying" and because the information was factually incorrect. *Id*. at 144.

Second, another employee "under [Plaintiff's] realm" embezzled approximately $6,000 by processing credits to her own credit card from ACN. (Regan Dep. at 145).  This employee was terminated immediately. *Id*.

Plaintiff was terminated on November 29, 2001 and remained unemployed through August of 2002.  Plaintiff is currently employed by another company as an accounts receivable manager.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P 56(c).  Defendants bear the initial responsibility of demonstrating that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; 106 S.Ct. 2548; 91 L.Ed. 2d 265 (1986). Material facts are determined by the substantive law in the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). All inferences must be made in a light most favorable to the non-moving party, in this case Plaintiff. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.  DISCUSSION

### A.  Plaintiff's Hostile Environment Claim

To establish a claim of hostile environment harassment under the Elliott-Larsen Civil Rights Act, Plaintiff must prove: (1) she belonged to a protected group; (2) she

13

was subjected to communication or conduct on the basis of sex; (3) she was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Haynie v. State*, 664 N.W.2d 129, 131, 468 Mich. 302 (2003).

The first two elements of the prima facie case are satisfied. Plaintiff, like all employees, is a member of a protected class for the purposes of the act. *Radtke v. Everett,* 501 N.W.2d 155, 162; 442 Mich. 368 (1993).

In addition, there is at least a factual dispute as to whether or not Plaintiff was subjected to communications and conduct on the basis of sex. Defendant argues that Plaintiff cannot show that but for the fact of her sex, she would not have been the object of harassment. However, Michigan's civil rights statute applies to situations where the plaintiff "allege[s] specific homosexual advances directed to [her] by [her] supervisor" because such actions are directly related to the plaintiff's gender. *See Barbour v. Department of Social Services*, 497 N.W.2d 216, 218; 198 Mich. App. 183 (1993). (internal citation omitted). Based on the facts in the record, including the comments concerning Plaintiff's breasts, there is a question of fact as to this element.

Thus, the issues in this case are: (1) whether the alleged acts were unwelcome, (2) whether the acts created a sufficiently hostile or offensive environment, that is, whether or not they were sufficiently "severe and pervasive," and (3) whether or not

14

Defendant had adequate notice of the harassment for the purposes of vicarious liability.

### 1.  Were the Acts Unwelcome?

The "welcome-ness" of sexual communications in the workplace is an issue generally loaded with factual questions that are difficult to resolve on summary judgment.  In *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986), the Supreme Court stated:

> [T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact...The correct inquiry is whether [Plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome[.]

*Vinson*, 477 U.S. at 68.

In *Radtke*, *supra*, the Michigan Supreme Court held that "[t]he threshold for determining that conduct is unwelcome is 'that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive."  *Radtke*, 442 Mich. at 384 (internal citations omitted); *see also Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 600 n.3, 450 Mich. 702 (1996) (Holding that "the [unwelcome sexual conduct] prong of this test was obviously met since [plaintiff] did not encourage nor desire the sexual overtures made by [defendant.]").  The *Champion* court cautioned that "[t]his Court generally does not make this sort of factual determination, such determinations being in the province of the factfinder."  *Id.*

In this case, Defendant argues that Plaintiff cannot demonstrate that the alleged sexual harassment was unwelcome because (1) she was not troubled enough to file a

report or complaint concerning the harassment; (2) she attended several social outings with Regan and Walski and gave Regan several gifts despite the alleged harassment; and (3) she openly initiated conversations having sexual content, including intimate details of her sex life.

First, Plaintiff's failure to file a report or to complain about the alleged harassment does not conclusively establish that the alleged acts were not unwelcome. Defendant cites *Walker v. City of Detroit*, 1999 WL 33435665 (Sep. 28, 1999) (unpublished), where the court held that the plaintiff satisfied this element of the prima facie case by testifying that she complained to a co-worker on five to ten occasions over two years.

*Walker* does not stand for the premise urged by Defendant, that is, that a plaintiff must complain in order to show unwelcome sexual harassment. Therefore, Plaintiff's failure to complain, standing alone, does not justify keeping her claims from a jury, especially in light of Plaintiff's testimony that she could not reasonably complain because her superiors participated in the alleged harassment.

Defendant's second argument is that the alleged conduct was not unwelcome because Plaintiff was able to participate in informal office gatherings and gave Kathy Regan gifts despite her alleged behavior. Defendant cites the following as evidence that Plaintiff did not by her conduct indicate that the sexual advances were unwelcome:

- Plaintiff attended a Tigers game with Regan and Walski on August 6, 2001;

- Plaintiff attended an office whirly ball outing with Regan and Walski on August 21, 2001;

16

- Plaintiff gave Regan an American flag lapel pin on October 16, 2001;

- Plaintiff gave Regan a portable TV for Bosses Day on October 16, 2001;

- Plaintiff worked with Regan and Walski to plan the office tailgate party on October 31, 2001;

- On November 1, 2001, after Plaintiff broke her ankle, she sent an e-mail to Regan and Walski asking them how she should get her toe ring off and discussing how she needed to shave her legs and get a pedicure so that her doctor, who may be "cute," would not think that she was "some hairy chick with bad feet."

Several of the foregoing events occurred after the alleged instances of sexual harassment. Defendant argues that the foregoing conduct "preclude[s] Plaintiff from showing that she *subjectively* perceived her work environment as sexually hostile."

Plaintiff testified that she told Walski she was sensitive about comments about her breasts; she told Diorka she did not want to discuss her "big boobs," she gave the sex toys to Seymour and said, "don't bring them back;" and told Regan "it stops now" after Regan threatened to tell headquarters about the sex toys.

Plaintiff also testified that the alleged sexual advances and conduct made her feel embarrassed and humiliated. According to Plaintiff, she returned to her office to cry and call her husband after her co-workers gave her the sex toys. (Wolshon Dep. at 359-60).

In addition, Plaintiff argues that Briana Bertalini-Landridge testified that Plaintiff appeared to be embarrassed when she received sex toys as a birthday gift and that she was bothered by the fact that Fransko and Diorka had seen them. Bertalini-Landridge actually testified that Plaintiff was not upset, but "it was like a laughing, I

17

can't believe you guys did this, hee-hee, hee-hee."  (Bertalini-Landridge Dep. at 44-

45).  Bertalini-Landridge thought Plaintiff was merely "bothered by the fact that Jane

(Diorka) and Adelle (Fransko) had seen [the sex toys]."  *Id.*

Finally, Defendant argues that Plaintiff was an active participant in sexually

themed joking around the office.  Defendant points to several instances in which

Plaintiff discussed aspects of her personal sex life and other sexual topics in frank and

explicit terms.  According to Plaintiff's co-workers, Plaintiff also joked about buying

various sex toys from a sex toy catalog, and thought a set of "sex dice" that another

employee brought to work was hilarious.

Plaintiff concedes that she engaged in sexual discussions and joking around the

office.  She argues that she would have looked like an "oddball" if she did not

participate in sex related joking and innuendo at work and that not participating

would have made it harder for her to work at ACN.  (Wolshon Dep. at 326-29).

Plaintiff cites an unpublished case from the First Circuit, *Horney v. Westfield*

*Gage Co., Inc.*, 77 Fed. Appx. 24, 29, 2003 WL 22326558 (1st Cir. 2003), where the

court held that

> [t]he jury could reasonably have distinguished between joking
> references to sexual material made by [Plaintiff], and her supervisor's
> screamed obscenities, offensive and derogatory comments regarding
> whether she or her mother were engaging in sex acts with particular co-
> workers, and statements about women's role at [the company].

*Horney*, *supra* at *3.

The question of whether or not conduct was unwelcome is particularly difficult

to resolve on summary judgment.  In this case, Plaintiff engaged in some sexual

18

conversations and jokes around the office.  However, it is unclear whether she behaved the way she did to avoid being a social outcast or because she truly "welcomed" such behavior.  Therefore, there is a genuine question of fact precluding summary judgment as to whether the alleged conduct was unwelcome.

## 2.  Were the Acts Severe and Pervasive?

The "essence of a hostile work environment action" is whether a supervisor or coworker created an environment hostile toward the plaintiff sufficient "to alter the conditions of employment" for the plaintiff.  *Radtke v. Everett*, 501 N.W. 2d 155, 163; 442 Mich. 368 (1993) (internal quotation omitted).  To survive summary judgment, Plaintiff must

> present documentary evidence to the trial court that a genuine issue existed regarding whether a reasonable person would find that, in the totality of circumstances, [the harasser's] comments to plaintiff were sufficiently severe and pervasive to create a hostile work environment.

*Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 320; 451 Mich. 358 (1996).

Among the factors to be considered are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Systems*, *Inc*., 510 U.S. 17, 21 (1993)  The harassment should be ongoing, rather than a set of isolated or sporadic incidents. *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999).  Plaintiff must show that the working environment was subjectively and objectively hostile.  *Harris*, 510 U.S. at 21-22.

19

Taking Plaintiff's allegations as true, she was subjected to the following acts of sexual harassment:

- In March of 2001, during their trip to Atlanta, Regan repeatedly told Plaintiff that she liked her and liked traveling with her.

- In July of 2001, during Plaintiff's performance review, Regan squeezed Plaintiff's shoulder. At the end of the meeting, Regan told Plaintiff how much she liked her and that she could be promoted to director within a year if Plaintiff would go out with her and get to know her better. Regan told Plaintiff that, "What is said in these four walls stays in these four walls."

- In August of 2001, Regan gave Plaintiff a gift certificate to Capelli's spa.

- In October of 2001, Regan gave Plaintiff a birthday present of candy and gift certificates to a movie theater near Regan's home.

- In late September or October of 2001, Defendant's CFO, Jayne Diorka, said to Plaintiff, "I see you're wearing your big boob shirt today," and "look at your big boobs on the table there." When Plaintiff suggested they proceed with the meeting, Diorka said, "I don't know what the problem is; a boob is a boob."

- When Plaintiff suffered an allergic reaction to a vaccination, Jayne Diorka said to her, "Oh my gosh. Look at your lips and how swollen they are. Are your other lips swollen too?" Later, on Plaintiff's birthday, Diorka signed Plaintiff's birthday card with, "Hey Lips! Kidding JD," surrounded by a red lips-shaped stamp.

- At a co-worker's wedding, Plaintiff mentioned that she wanted a Coach purse and Regan said she would buy it for her. Regan also bought Plaintiff drinks throughout the reception and asked Plaintiff to dance with her during a slow song. Plaintiff danced with a friend's husband to avoid Regan.

- On Plaintiff's birthday in October of 2001, her co-workers bought her several sex toys and an R-rated card featuring a naked man covered only by a discreet bow. Several employees, including CFO Diorka, participated in ongoing office humor about the sex toys.

20

- On one occasion, Diorka walked behind Plaintiff, threw a bag of dolphin crackers at her, and stated that she could never look at a dolphin the same way again.

Recently, in *Clark v. United Postal Service, Inc.*, 400 F.3d 341, 348 (6th Cir. 2005), held that an administrative assistant presented sufficient evidence of hostile work environment harassment where she presented seventeen incidents of harassment by her supervisor over a two-year period, including an incident where her supervisor tossed a vibrating pager between her legs, and five incidents where he grabbed her hand in a "high-five" fashion. *Clark*, 400 F.3d at 352.[1]

On the other hand, the court held that a manager failed to prove a severe and pervasive hostile environment claim as a matter of law where, over two and a half years, her supervisor told vulgar jokes, twice placed his vibrating pager on her thigh, and pulled at her overalls after she told him she was wearing a thong. *Clark*, 400 F.3d at 351.

In this case, viewed in the light most favorable to Plaintiff, the facts present a triable jury question as to whether or not the work environment was sufficiently severe and pervasive. Like the administrative assistant in *Clark*, *supra*, Plaintiff has presented an "ongoing pattern of unwanted harassment." *Clark*, 400 F.3d at 352.

The conduct of ACN's chief financial officer, Jayne Diorka, who made comments about Plaintiff's "big boobs," asked whether her labia were swollen, and threw dolphin crackers at her, is the most offensive conduct in the record and is sufficiently severe and pervasive to preclude summary judgment.

---

[1]Judge Guy dissented in *Clark* because he did not think the alleged acts of harassment were sufficient to create a hostile work environment. *See Clark*, 400 F.3d at 353 (Guy, J., dissenting).

21

Also, the Court emphasizes that in this case, all of the incidents occurred within an eight month period, as compared to more than a two-year period in *Clark*.  The occurrence of potentially harassing incidents in a shorter time frame could lead a reasonable jury to conclude that the conduct was sufficiently severe and pervasive to warrant liability for hostile work environment sexual harassment.

Defendant has made a concerted effort at explaining away each individual allegation of harassment.  However, the Court cannot separate individual instances of offensive conduct, but rather should consider all of the alleged events as a whole.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) (holding that the district court improperly "disaggregated" the plaintiff's allegations and robbed them of their cumulative effect.)

In this case, viewing the evidence in the light most favorable to Plaintiff, the cumulative effect of the alleged incidents, which occurred over an eight-month period, is sufficient to establish that her co-workers and supervisors' behavior was severe and pervasive enough to create a hostile work environment.

### 3.  Vicarious Liability/Notice

Under Michigan's Civil Rights Act, employers are not strictly liable for harassment by supervisors or co-workers.   In *Chambers v. Trettco*, 591 N.W.2d 413; 232 Mich. App. 560 (1998), the Court clarified that

> [a sexual harassment] violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment.

*Chambers*, 614 N.W. 2d at 916 (internal citations omitted) (emphasis in original).

The Michigan Court of Appeals has described the standard for vicarious liability as follows:

> [Plaintiff] must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action…The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment…or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.

*McCarthy v. State Farm Ins. Co.*, 428 N.W.2d 692, 694-95; 170 Mich. App. 451 (1988), overruled in part on other grounds, *Norris v. State Farm Fire & Cas. Co.*, 581 N.W.2d 746; 229 Mich. App. 231 (1998).

"[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers*, *supra* at 419.

In this case, Plaintiff's direct supervisor, Kathy Regan, testified that both she and her supervisor, CFO Jayne Diorka were aware of the sex toys. Regan even threatened via e-mail to tell ACN's executives about the sex toys. In this way, Regan used the sexual nature of the toys against Plaintiff as leverage for gaining information concerning office rumors.

In addition, Diorka commented about Plaintiff's "big boobs," asked her if her "lips" were swollen, and threw dolphin crackers at her. There is a factual dispute as to whether or not Regan witnessed these incidents. However, there is no dispute that

23

Plaintiff's supervisors at ACN did absolutely nothing to address or control such behavior.

Because Plaintiff's supervisors participated in the alleged incidents of sexual harassment, it is fair to conclude that they knew, or in the exercise of reasonable care should have known, of a hostile or offensive work environment.  *See Elezovic v. Ford Motor Company*, 697 N.W.2d 851, 861 n.4; 472 Mich. 408 (2005).  Therefore, Defendant's motion for summary judgment will be DENIED as to Plaintiff's hostile environment claim.

## B.  Plaintiff's *Quid Pro Quo* Claim

To establish a claim of *quid pro quo* harassment, Plaintiff must prove: (1) that she was subject to any of the types of unwelcome sexual conduct or communication describe in the statute; and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment.  *Chambers v. Trettco, Inc.*, 463 Mich. 297, 310; 614 N.W.2d 910 (2000) (internal quotation omitted).  Plaintiff need not show severe or pervasive conduct, but only that her employer threatened or conditioned some aspect of her employment on submission to sexual advances.  *Champion v. Nationwide Sec*. 545 N.W.2d 596, 600; 450 Mich. 702 (1996).

"[Q]uid *pro quo* harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit."  *Champion v. Nation Wide Security, Inc.*, 545 N.W.2d 596, 601; 450 Mich. 702 (1996).

24

In *Plumb v. Abbott Labarotories*, 60 F.Supp.2d 642, 649 (E.D.Mich. 1999) (Steeh, J.), the court held that "[m]erely offensive sexual conduct which is not directed at an employee with the explicit or implicit understanding that fulfillment of a sexual proposition will lead to job benefits or that rejection of sexual advances will yield serious employment consequences, does not give rise to a *quid pro quo* claim." Thus, the "essence of a *quid pro quo* claim" is whether or not the employer's actions "amounted to an invitation to engage in some sort of sexual activity [with her], either explicitly or implicitly."  *Id.*

In *Plumb*, *supra*, the court held that an invitation to have dinner, standing alone, was not sufficient to satisfy the "unwelcome sexual advance" element of a *quid pro quo* claim:

> Even [plaintiff's] contention that [her supervisor] asked her to dinner the night before a business meeting, without more, fails to give rise to an inference that he was sexually propositioning her.  For two co-workers to dine together when they are both traveling in the same location on business is commonplace and the mere fact that one of the workers is a woman and the other is a man, standing alone, does not transform a business engagement into a romantic encounter.  Had [the supervisor] invited plaintiff to his hotel room for dinner via room service, the court's analysis would of course be different.

*Plumb*, *supra* at 649.

In this case, Plaintiff claims that her supervisor implicitly proposed to exchange sex for a promotion by telling her she could be promoted within a year if she went out with her one evening and got to know her better.  Regan allegedly said that nobody would believe Plaintiff if she complained of the incident and said, "What is said in these four walls stays in these four walls."

25

Viewing the evidence in the light most favorable to Plaintiff, the facts in this case are more serious than those at issue in *Plumb*. There is a factual dispute as to whether or not Plaintiff's supervisor told her she would be considered for promotion if she undertook a more intimate, personal relationship with her. It is for a jury to decide whether or not such a proposition was an implicit invitation for sex. It is also for a jury to decide whether or not the supervisor's additional statement, which suggested that no one would believe Plaintiff, demonstrates *quid pro quo* harassment.

The Court finds that the factual dispute between Plaintiff and Regan as to alleged incident precludes summary judgment on Plaintiff's *quid pro quo* harassment claim. Therefore, Defendant's motion for summary judgment will be DENIED as to Plaintiff's *quid pro quo* claim.

### C.  Retaliation

As to retaliation, Michigan's Civil Rights Act provides:

> Two or more persons shall not conspire to, or a person shall not: (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

MCL 37.2701(a).

To establish a prima facie case of retaliation, Plaintiff must prove: (1) that she engaged in a protected activity; (2) that this was known by Defendant; (3) that Defendant took an employment action adverse to Plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

26

*Pena v. Ingham Co. Rd. Comm.*, 255 Mich. App. 299, 310-311; 660 N.W.2d 351 (2003).

In order to constitute protected activity under the Civil Rights Act, [t]he employee's charge must clearly convey to an objective employer that the employee is raising the spectre of a claim of unlawful discrimination pursuant to the CRA." *Barrett v. Kirtland Community College*, 245 Mich. App. 306, 319; 628 N.W.2d 63 (2001).

Plaintiff's brief does not address the standard stated in *Barret, supra*. Rather, Plaitniff cites *EEOC v. Domino's Pizza, Inc.*, 909 F.Supp. 1529 (M.D. Fla. 1995), where the court held that the plaintiff had engaged in sufficient "oppositional" activity by telling his supervisor that if she continued to make sexual advances toward him, he would report the conduct to her supervisor. *Id. at* 1336.

As discussed above, Plaintiff testified that she told Walski she was sensitive about comments about her breasts; she told Diorka she did not want to discuss her "big boobs," she gave the sex toys to Seymour and said, "don't bring them back;" and told Regan "it stops now" after Regan threatened to tell headquarters about the sex toys.

No reasonable fact finder could conclude that Plaintiff engaged in protected activity because none of the foregoing comments would raise the spectre of a discrimination claim.

In addition, Plaintiff's evidence could not satisfy the more permissive standard set forth in *Domino's Pizza, supra*, because the statement "it stops now" does not convey the same oppositional message as "stop harassing me now, or I will report you

27

to our supervisor," or words to that effect.  Therefore, Defendant's motion for summary judgment will be GRANTED as to Plaintiff's retaliation claim.

## V.  CONCLUSION

Based on the foregoing, the Court HEREBY ORDERS AS FOLLOWS:

1.  As to Plaintiff's hostile environment claim, Defendant's motion for summary judgment is DENIED;

2.  As to Plainiff's *quid pro quo* claim, Defendant's motion for summary judgment is DENIED;

3.  As to Plaintiff's retaliation claim, Defendant's motion for summary judgment is GRANTED.


s/Arthur J. Tarnow
_____
Arthur J. Tarnow
United States District Judge

Dated:  July 29, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 29, 2005, by electronic and/or ordinary mail.

s/Theresa E. Taylor
_____
Case Manager
